**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA**

| | | |
|---|---|---|
| EILEEN ANDREA CHASE, et al, | ) | |
| | ) | Case No. 1:24-cv-265 |
| *Plaintiffs*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Michael J. Dumitru |
| ANDREW B. MORGAN, | ) | |
| | ) | |
| *Defendant*. | ) | |

---

**MEMORANDUM OPINION**

---

Before the Court is Plaintiffs' motion for a preliminary injunction (Doc. 11), which the parties have agreed is to be decided on the written record without an evidentiary hearing (*see* Doc. 35). In connection with Plaintiffs' motion for a preliminary injunction, the Parties have also filed several motions to exclude: (1) Defendant's motion to exclude portions of the declarations of Destiny Arnold and Chrissy Blackwell (Doc. 17); (2) Plaintiffs' motion to exclude portions of the declaration of Natalie Barrionuevo (Doc. 27); (3) Plaintiffs' motion to exclude portions of the declaration of Jessica Conine (Doc. 28); (4) Plaintiffs' motion to exclude portions of the declaration of Gabria Hubbard (Doc. 29); (5) Plaintiffs' motion to exclude portions of the declaration of Defendant (Doc. 30); and (6) Plaintiffs' motion to exclude portions of the declaration of Melissa Parsons (Doc. 31). For the following reasons, the Court will **DENY** Plaintiffs' motion for a preliminary injunction (Doc. 11) and **DENY AS MOOT** all motions to exclude (Docs. 17, 27, 28, 29, 30, 31.)

# I.    BACKGROUND

Plaintiffs are Solomon Family Solutions ("SFS"), a provider of children's services, and its co-founders and co-executive directors, Eileen "Andrea" Chase and Blythe Mayfield.  (*See* Doc. 12-8, at 1.)  At all times relevant to this litigation, Chase was also a political candidate for the Tennessee House of Representatives.  (*See id.*)  Defendant Andrew B. Morgan is an elected state court judge at the Bradley County Juvenile Court ("BCJC").  (*See* Doc. 19, at 1.)  This litigation, in which Plaintiffs bring several claims alleging violations of their First Amendment and Fourteenth Amendment rights under 42 U.S.C. § 1983, arises out of a lengthy and often personal dispute between the Parties—particularly between Chase and Morgan.  Broadly speaking, it appears each side has become convinced that the other is incompetent and unfit for their job (Plaintiffs, as providers of children's services; Morgan, as a juvenile court judge).  (*See generally* Docs. 12, 18, 19.)

According to Chase's declaration, Morgan "began publicly promoting an SFS competitor, Blended Recovery, as the Court's preferred provider of child and family welfare services" during the year after his election, and in May 2023, he announced BCJC would be "partnering" with Blended Recovery.  (Doc. 12-8, at 1–2.)  Plaintiffs contend, and Morgan does not dispute, that BCJC's contractual relationship with Blended Recovery consisted of leasing space at the courthouse to Blended Recovery, such that it could provide services to children and families who were parties to litigation at BCJC.  (*See id.*; Doc. 12, at 3–4.)  Chase represents she then exchanged emails with Morgan in June 2023 to inquire about whether BCJC had space for SFS, and Morgan told her no space was available.  (*See* Doc. 12-8, at 2.)  On July 17, 2023, Chase filed a report to the Tennessee Department of Children's Services ("DCS") "alerting them to [her] concerns regarding Judge Morgan's conduct, including his attempt to create a local

monopoly for Blended Recovery." (*Id.*) She then filed a similar complaint with the Tennessee Board of Judicial Conduct on July 31, 2023. (*See id.*)

On December 19, 2023, Chase created a TikTok account under the handle "@impeachjudgemorgan," where she began making public posts criticizing Morgan. (*See id.*; Doc. 12-1.) Around the same time, she filed another report with DCS, then alleging that Morgan had stayed overnight at the juvenile detention center on at least one occasion,[1] in response to which DCS sent an investigator to drop in on BCJC. (*See* Doc. 12-8, at 2–3.) According to Destiny Arnold, who became the president of SFS's board that same month and was also a former client of Morgan's, Morgan called her on December 28, 2023 (the "Arnold Call"), to relay that Chase had "crossed the line" in her most recent DCS report and was "trying to have him defamed" through this and her social media activity.[2] (*See* Doc. 12-6.)

On May 8, 2024, Chase authored a post on her political Facebook page, "Andrea Chase for TN," with the heading "CALL TO ACTION" (the "call-to-action post"), which read,

> To ALL Bradley County and surrounding area parents, guardians, and concerned citizens, I am creating a coalition and support group for those impacted and hurt by the failure, ignorance, and negligence of DCS, Juvenile Court, law enforcement, nonprofit organizations, mental health professionals, and attorneys causing the endangerment and harm of children.
>
> I am already well aware of and have personal experience with such atrocities in our community that I will never remain silent! I promise you are not alone! . . .
>
> Together WE will protect our children from the arrogance, ignorance, and corruption of those in positions of power. Our children and community deserve better! Truth and justice will prevail!

---

[1] There is no evidence in the record substantiating this allegation.

[2] Morgan moves to exclude certain statements from Arnold's declaration for lack of personal knowledge under Federal Rule of Evidence 602. (*See* Doc. 17, at 1–2.)

(Doc. 12, at 5.)  Later in May 2024, Morgan sent a letter to "members of the local community" (the "May 2024 Letter").  (Doc. 12-8, at 3.)  Morgan contends he actually drafted the letter on April 18, 2024, prior to the call-to-action post, but he does not dispute that he sent it after the post.  (*See* Doc. 19, at 12.)  The May 2024 Letter proceeds in three parts:  (1) it begins by stating, "Solomon Family Solutions has been removed as a service provider in Bradley County Juvenile Court due to the following bad acts. . ."; (2) it then enumerates those "bad acts" including, inter alia, "[r]epeated breaches of confidentiality and HIPAA," "lying to the Court and the public," "[r]epeated filing of false reports to the [DCS]," "[k]nowingly making false allegations of pecuniary gain by the Court in exchange for children," "[k]nowingly making libelous statements about the Judge," and "[k]nowingly making slanderous statements about the Judge, Court staff, and others"; and (3) it concludes, "[d]ue to the foregoing reasons, Solomon Family Solutions, Andrea Chase and Blythe Mayfield will not be utilized in any way by the Bradley County Juvenile Court."  (Doc. 12-2, at 1.)

On May 16, 2024, Morgan sent an email to members of the SFS board with the subject line "Concerns with Protect Our Children Coalition" (the "May 2024 Email").  (Doc. 12-3; *see* Doc. 12-8, at 4.)  The May 2024 Email, which includes references to Chase's TikTok posts and the call-to-action post, expresses various concerns related to Chase and Mayfield's conduct, particularly "Chase's failure to take confidentiality seriously," and eventually states, "I do feel the need to insist that reasonableness prevail and this 'coalition' be shut down before innocent children are injured in a narcissistic ploy at attention."  (Doc. 12-3, at 1–2.)  The May 2024 Email was sent from "judgeandrewbmorgan@gmail.com," and it includes an email signature that reads "Judge Andrew B. Morgan" and contains a graphic labeling him a "Trust-Based Relational Intervention Practitioner."  (*Id.*)

Morgan also operates a Facebook page titled "Judge Andrew B. Morgan" (the "Facebook page"), which states in its introduction, "[t]his is an informational page for Judge Andrew B. Morgan, Bradley County General Sessions Court Div I." (Doc. 12-4, at 1.) Plaintiffs submitted a series of screenshots from the Facebook page, which include, for example, posts commending BCJC's handling of difficult cases, posts about BCJC's community programing and events, a post "bring[ing] to the public's attention" details of Tennessee mandated reporting laws, and a job posting for corrections officers. (*See id.* at 2, 4–5, 6, 8.) Based on screenshots Plaintiffs submitted, which they represent were taken from Chase and Mayfield's personal Facebook accounts, it appears that at some point following the events of May 2024, Morgan blocked Chase and Mayfield from the Facebook page. (*See* Doc. 12-5.) The Parties, however, dispute whether Chase and Mayfield are *currently* blocked from his Facebook page. (*See* Doc. 12-8, at 5.; Doc. 12, at 19.) In the event they are no longer blocked from the Facebook page, it is unclear from the record and the Parties' representations when Morgan would have unblocked them. (*See* Doc.12-8 (Chase declaring she and Mayfield remained blocked "[a]s of the filing of this Motion"; Doc. 19, at 12 (Morgan stating in his response, "they are not blocked"); Doc. 25 (Plaintiffs stating in reply, "[e]ven if the Plaintiffs are unblocked . . .").)

Plaintiffs filed an amended complaint on October 28, 2024, asserting the following claims: (1) retaliation against First Amendment protected speech, (2) third-party coercion in violation of the First Amendment, (3) prior restraint in violation of the First Amendment, (4) viewpoint discrimination in violation of the First Amendment, (5) a declaratory judgment that a restraining order issued by Morgan constituted a prior restraint in violation of the First

5

Amendment,[3] (6) prior restraint and viewpoint discrimination in relation to the alleged Facebook blocking, (7) denial of procedural due process under the Fourteenth Amendment, (8) "stigma plus" defamation in violation of the Fourteenth Amendment, and (9) a declaratory judgment "as alternative relief for each of the constitutional violations alleged in Claims 1-4 and 6-8." (Doc. 10, at 17–25.) Plaintiffs filed this motion on the same day, seeking four types of preliminary relief": (1) an injunction prohibiting Morgan "from blocking Plaintiffs Chase and Mayfield from the Judge Andrew B. Morgan Facebook [page]"; (2) an injunction ordering Morgan "to publicly retract" the May 2024 Letter and the May 2024 Email; (3) an injunction prohibiting Morgan "from taking any further actions to coerce, threaten, or intimate repercussions directly or indirectly to third parties for Plaintiff Chase's protected speech activities; and (4) an injunction prohibiting Morgan "from taking any non-judicial action to punish or sanction any plaintiff based on the First Amendment protected speech of any plaintiff." (Doc. 11, at 1–2.)

## II.     MOTION FOR PRELIMINARY INJUNCTION

### A.     Standard of Law

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). The Court considers the following factors when evaluating a motion for preliminary injunction:

(1) whether the movant has a strong likelihood of success on the merits;
(2) whether the movant would suffer irreparable injury without the injunction;
(3) whether issuance of the injunction would cause substantial harm to others; and
(4) whether the public interest would be served by the issuance of the injunction.

---

[3] The Parties do not discuss this restraining order in their briefings on the instant motion. (*See* Docs. 12, 19, 25.)

*Id.* at 542 (citations omitted).

The Sixth Circuit has noted that "when a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (citations omitted). Furthermore, the Court need not "make specific findings concerning each of the four factors . . . if fewer factors are dispositive of the issue." *Id.* (citations omitted). However, "it is generally useful for the district court to analyze all four of the preliminary injunction factors." *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000)). Rather than function as "rigid and unbending requirements[,]" the factors "simply guide the discretion of the court." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992) (citation omitted).

"The party seeking a preliminary injunction bears the burden of justifying such relief." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) (citations omitted). While a party seeking a preliminary injunction need not "prove [its] case in full at a preliminary injunction hearing," *Tenke*, 511 F.3d at 542 (citations omitted), a preliminary injunction is an "extraordinary and drastic remedy." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), and "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739.

**B.     Likelihood of Success on the Merits**

Plaintiffs argue Morgan violated their First Amendment rights in four ways:  (1) viewpoint discrimination, (2) retaliation against protected speech, (3) coercion of a third party, and (4) prior restraints on protected speech.  (*See* Doc. 12, at 10–16.)  They bring their claims under 42 U.S.C. § 1983, which provides in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To succeed on a claim under § 1983, a plaintiff must show "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law."  *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citations omitted).  The state-action requirement—that a Morgan must have been "acting under color of law" when engaging in the allegedly unconstitutional conduct—is a threshold inquiry for all § 1983 claims; when there is no state action, there can be no liability.  *See id.*

**i.     *Viewpoint Discrimination***

"Viewpoint discrimination occurs when speech is restricted because of the speaker's viewpoint on a topic, meaning but for the perspective of the speaker, the speech would normally be permissible."  *Davis v. Colerain Township*, 551 F. Supp. 812, 818–19 (6th Cir. 2021).  As compared to other restrictions on speech, viewpoint discrimination is considered particularly "egregious" because, as the Supreme Court has explained, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  Like all content-based restrictions on speech, viewpoint discrimination is "presumptively unconstitutional" and subject to strict scrutiny.  *See Reed v.*

*Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Here, Plaintiffs argue Morgan engaged in unlawful viewpoint discrimination by sending the May 2024 Email and by blocking Chase and Mayfield from the Facebook page. (*See* Doc. 12, at 15–16.)

a.     The May 2024 Email

To the extent Plaintiffs maintain the May 2024 Email constitutes viewpoint discrimination, they fail to address a key problem: although the email may certainly be construed as an attempt at *persuasion*, they have proffered no evidence demonstrating that it constitutes a *restriction* of Plaintiffs' speech.[4] *See Davis*, 551 F. Supp. at 818–19; (*see generally* Doc. 12-3). A suggestion that speech is unreasonable or unpersuasive—which Morgan clearly makes ("I have grown accustomed to the ridiculous claims that come from SFS, Mrs. Chase, Ms. Mayfield and the Impeach page")—does not amount to a restriction on speech. (Doc. 12-3, at 2.) Nowhere in the email, for instance, does Morgan order Plaintiffs to refrain from any specific form of expression. (*See id.*) While his language expresses a clear position on the activities of the "Protect Our Children" coalition and what Morgan sees as concerning breaches of confidentiality, it does not appear he is threatening any kind of legal sanction should Plaintiffs continue to express contrary viewpoints:

> I do feel the need to insist that reasonableness prevail and this "coalition" be shut down before innocent children are injured in a narcissistic ploy at attention. *If it must continue, so be it, but please*, resistance should be made against sharing information that is confidential involving children to a party that has no right to it.

(*Id.* (emphasis added).) Simply put, this language likely constitutes an attempt to persuade, not a legal restriction. When he notes "it is certainly my right to keep SFS out of my Court," Morgan

---

[4] This is *in addition* to a threshold issue the Court will discuss in the next section (in the context of Plaintiffs' retaliation claim): it is not clear that the email satisfies the state-action requirement. *See infra* 15–18.

seems to be referring to the decision for BCJC not to contract with SFS.[5]  (*Id.*)  But to the extent

that decision is a response to Plaintiffs' protected speech, it sounds in retaliation rather than

restriction.  *See Davis*, 551 F. Supp. at 818–19; *Ryan v. Blackwell*, 979 F.3d 519, 526 (6th Cir.

2020) (explaining elements of a retaliation claim); (*id.*).  Thus, Plaintiffs have not shown they are

likely to succeed on this ground.

b.    The Alleged Facebook Blocking

In *Lindke v. Freed*, the Supreme Court established a special test for state action in the

social-media context:  "a public official's social-media activity constitutes state action under §

1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2)

purported to exercise that authority when he spoke on social media."  601 U.S. 187, 198 (2024).

"The appearance and function of the social-media activity," the Supreme Court explains, "are

relevant at the second step [of the test], but they cannot make up for a lack of state authority at

the first."  *Id.*  To satisfy the actual-authority prong, it is not sufficient for an official to speak

*about* his job—he must have, pursuant to his responsibilities, some *authority to speak* to the

public on social media.  *See id.* at 199 ("Freed[ a city manager]'s conduct is not attributable to

the State unless he was 'possessed of state authority' to post city updates and register citizen

concerns.") (quoting *Griffin v. Maryland*, 378 U.S. 130, 135 (1964)).  Such authority to speak

cannot be generalized or abstract; rather, the social-media activity at issue must relate to some

"matter within [an official's] bailiwick," *id.*, or as the Sixth Circuit put it on remand, "a specific

matter within his portfolio of responsibilities," *Lindke v. Freed*, 114 F.4th 812, 816 (6th Cir.

---

[5] This interpretation is consistent with an earlier reference to "the removal of SFS."  (*Id.* ("As
you may know, one of the primary reasons for the removal of SFS was . . .").)

2024).  Finally, "the grant of actual authority must come from one of the sources mentioned in 42 U.S.C. § 1983: 'statute, ordinance, regulation, custom, or usage.'"  *Id.* (quoting § 1983).

Here, Plaintiffs argue the actual-authority prong is satisfied because Morgan "is the elected Judge of the Juvenile Court and he is posting about the conduct of juvenile court proceedings, public events, and policies of the Juvenile Court"; but this argument is plainly insufficient under *Lindke*.  (Doc 12, at 15); *see* 601 U.S. at 198.  While the screenshots Plaintiffs have provided of the Facebook page appear indeed to be "*about* the conduct of juvenile court proceedings, public events, and policies," this does not constitute state action in the absence of evidence indicating "he was 'possessed of state authority' to post" on these topics pursuant to his duties.  (Doc. 12, at 15 (emphasis added)); *Lindke*, 601 U.S. at 199 (quoting *Griffin*, 378 U.S. at 135).  *See* Doc. 12-4 (Plaintiffs' screenshots of posts from the Facebook page), at 2 (discussing generally how BCJC handled "a terrible case with a heartbreaking ending"), 4 (recapping BCJC's "kick[] off" of its "PATH program with 15 of our kids and nearly the full staff as well as our friends at CASA and CareEquip!"), 5 ("brag[ging] on some folks" who successfully handled "130 juvenile cases on our docket").  Plaintiffs have cited no evidence to show, nor have they otherwise explained, how Morgan has actual authority pursuant to "statute, ordinance, regulation, custom, or usage" to make these posts.[6]  § 1983; *see Lindke*, 114 F.4th at 816.

---

[6] It is not entirely clear from the *Lindke* opinion what, precisely, would constitute evidence of an official's actual authority to post on social media, *see* 601 U.S. at 198–99; presumably, for instance, not many state statutes contemplate expressly that an official could or should carry out their duties on Facebook.  Nonetheless, *Lindke* makes clear that the Court should focus at least on whether an official has actual authority to speak to the public through social media "on the State's behalf" in the particular context, and on the particular subject, at issue.  *See id.*  Here, Plaintiffs have provided no evidence to that effect, and there is reason to suspect such evidence may be especially difficult to identify when the defendant is a state court judge, because, as a general matter, judges have authority to speak to the public *insofar as they speak through judicial orders or opinions* (which do not occur through social media).  In the absence of affirmative evidence (whether it be through "statute, ordinance, regulation, custom, or usage," §

Accordingly, Plaintiffs have not shown a likelihood of success on the actual-authority requirement for state action, and this deficiency alone is enough to derail their viewpoint-discrimination claim. *See Lindke*, 601 U.S. at 198.

But there is another, equally fundamental reason Plaintiffs cannot meet their burden on this claim—they may not have standing. To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). In the context of a viewpoint-discrimination claim contesting an official's social-media conduct, it stands to reason that, to give rise to an injury, the defendant's conduct should *prevent* the plaintiff in some "concrete and particularized" fashion from expressing a viewpoint. *Id.* (noting an injury must be "concrete and particularized" and "actual or imminent") (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In *Lindke*, for example, Lindke expressed his disapproval of the city's handling of the Covid-19 pandemic by posting comments to that effect on Freed's Facebook page, and Freed, a city manager, reacted by deleting those comments and ultimately blocking him. *See* 601 U.S. at 193. Although standing was not at issue in *Lindke*,[7] the Supreme Court's account of the facts suggests standing was readily satisfied in that case because (1) when Freed deleted Lindke's comments, he was allegedly censoring Lindke's viewpoint, and (2) by then

---

1983), therefore, the Court is not convinced Morgan had actual authority under *Lindke* to speak to the public through the *Facebook* page. *See* 601 U.S. at 198.

[7] The only issue before the Supreme Court in *Lindke* was the proper test for state action in the social-media context. *See generally id.* The *Lindke* court did not ultimately decide whether there was state action, remanding instead to the Sixth Circuit for application of its new test; it thus also did not analyze the merits of Lindke's First Amendment claim. *See id.* at 204. Nonetheless, given the facts as summarized above and by the Supreme Court, the contours of the First Amendment injury that *Lindke* would present were state action satisfied are clear. *See id.* at 192–93.

blocking him from the page entirely, he prevented Lindke from expressing his views in the future given that, "[o]nce blocked, Lindke could see Freed's posts but could no longer comment on them." *Id.*

Here, in contrast to *Lindke*, Plaintiffs have cited no evidence to show that they have commented on the Facebook page in the past or desire to comment on it (or even otherwise engage with it) in the future. *See id.*; (Doc. 12, at 6–8, 15–16).[8] Plaintiffs contend only that Morgan blocked Chase and Mayfield from the Facebook page. (*See id.*) Consider a "last point" the Supreme Court makes in *Lindke*, which addresses how the state-action implications of a blocking differ from those of deleted comments: "Blocking, however, is a different story. Because blocking operated on a page-wide basis, a court would have to consider whether Freed had engaged in state action *with respect to any post on which Lindke wished to comment*." 601 U.S. 204 (emphasis added). Although this point arises in the context of state action, it also sounds in standing insofar as it implies there must be a particular "post on which [a plaintiff] wished to comment" for a state actor's conduct to have caused a First Amendment injury. *Id.* Here, therefore, when there is no evidence that Plaintiffs have ever commented on the Facebook page or would comment on it were they able, it is not clear how they have suffered an "actual or imminent" injury (and Plaintiffs have cited no authority to suggest that a blocking can *in itself* constitute an injury sounding in viewpoint discrimination).[9] *Lujan*, 504 U.S. at 560; (*see* Doc. 12, at 6–8, 15–16). The absence of such evidence also demonstrates the element of redressability is lacking, because if Plaintiffs have no desire or plans to express a viewpoint on the Facebook

---

[8] There are also no allegations to this effect in Plaintiffs' amended complaint. (*See* Doc. 10, at 16–17.)

[9] Additionally, it is unclear whether simply expressing a desire to comment on a page were a plaintiff not blocked would be sufficient to show an injury in the absence of evidence of past comments.

page, it is not clear how an order compelling Morgan to give them access to it could redress a First Amendment violation. *See Daunt*, 956 F.3d at 417. Thus, Plaintiffs have not shown a likelihood that they even have standing to bring their claim regarding Morgan's Facebook page.

Finally, there is the factual dispute as to whether Plaintiffs are still blocked from the Facebook page and, if not, when they were unblocked. (*See* Doc. 12-8, at 5; Doc. 19, at 12.) However, given the clear defects the Court has identified regarding the threshold inquiries of state action and standing, it need not reach either the evidentiary issues related to the current status of Plaintiffs' access to the Facebook page or any remaining constitutional issues.

### ii. *Retaliation*

"[R]etaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment." *Zilich v. Longo*, 34 F.3d 359, 364 (6th Cir. 1994) (citation omitted). To prevail on a First Amendment retaliation claim under § 1983, a plaintiff must demonstrate three elements: "(1) he engaged in constitutionally protected speech, (2) [the] defendant's adverse action caused an injury that would chill a person of ordinary firmness from continuing the activity, and (3) that action was motivated at least in part by the plaintiff's exercise of his constitutional rights." *Ryan*, 979 F.3d at 526. Plaintiffs contend Chase engaged in protected speech regarding Morgan on several occasions including her reports to the DCS, her complaint with the Tennessee Board of Judicial Conduct, her posts on the "@impeachandrewmorgan" TikTok account, and her call-to-action post. (*See* Doc. 12, at 10.) Plaintiffs then identify four actions they argue Morgan took in retaliation to Chase's protected speech[10]: (1) Morgan's call with Destiny Arnold on December 28, 2023, in which they contend

---

[10] Plaintiffs contend Morgan "mistakenly believed that Plaintiff Mayfield was also participating in Andrea Chase's speech activities and intended to punish them" both. (*Id.*)

he "intimat[ed] threats" (the "Arnold Call"); (2) the May 2024 Email; (3) the May 2024 Letter[11]; and (4) "banishing them from providing services to people who are or may become parties to Bradly County Juvenile Court cases." (*Id.*)

    a.   <u>State Action</u>

As a threshold inquiry, Plaintiffs must establish state action, meaning they must show the alleged retaliatory actions were taken while Morgan was "acting under color of law." *Robertson*, 753 F.3d at 614. Plaintiffs cite no legal authority relevant to whether the specific actions they argue are retaliatory satisfy this requirement; however, the Court has serious doubts about whether either the Arnold Call or the May 2024 Email constitute state action. (*See* Doc. 12, at 10–14.) Not all speech by a state official is state action—as the *Lindke* court explains,

> [State] officials may look like they are always on the clock, making it tempting to characterize every encounter as part of the job. But the state-action doctrine avoids such broad-brush assumptions—for good reason. While public officials can act on behalf of the State, they are also private citizens with their own constitutional rights. . . . "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." This right includes the ability to speak about "information related to or learned through public employment," so long as the speech is not "itself ordinarily within the scope of the employee's duties."

601 U.S. at 196–97 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *Lane v. Franks*, 573 U.S. 228, 236, 240 (2014)) (internal citations omitted). Furthermore, "[the Supreme] Court has frequently emphasized that the state-action doctrine demands a fact-intensive inquiry." *Id.*

---

[11] Morgan contends this letter was actually drafted on April 18, 2024, "almost a month prior to the 'Call to Action' post." (Doc. 19, at 12.) He does not dispute, however, that the other actions Plaintiffs contend were protected speech (the formal complaints and the TikTok posts) took place prior to April 2024, (*see generally id.*); thus, even if Morgan is correct that it was drafted prior to the call-to-action post, the letter could still have been drafted in retaliation to those other actions by Chase. (And this is to say nothing of the possibility, which Morgan does not address, that the act of *sending* the letter in May may constitute retaliation against the call-to-action post even if the original *drafting* of the letter did not.)

(citing, "*e.g.*," *Reitman v. Mulkey*, 387 U.S. 369, 378 (1967); *Gilmore v. Montgomery*, 417 U.S. 556, 574 (1974)).

As to the Arnold Call, the Parties do not dispute that this was a phone call Morgan made to Arnold, who was his former client, to share his concerns that Chase had (as Plaintiffs summarize) "crossed the line with her reports of a child being in custody that was mistreated." (Doc. 12, at 4; *see* Doc. 12-6.) Given that this was a seemingly private phone call (Plaintiffs do not allege, for instance, that he used a government phone or was otherwise "on the clock," *Lindke*, 601 U.S. at 196) and was made to a person with whom Morgan had some prior connection, the Court is not convinced Plaintiffs are likely to satisfy the state-action requirement for the Arnold Call *regardless* of the contents of the discussion. (*See* Doc. 12, at 4; Doc. 12-6). The fact that the call concerned what may have been protected speech (Chase's report to the DCS) is insufficient to overcome what appears to be a lack of state action. *See Lindke*, 601 U.S. at 196–97.

Plaintiffs have also failed to demonstrate that the May 2024 Email satisfies the state-action requirement. As the Supreme Court cautions, the mere fact that an official's speech concerns "information related to or learned through" his employment cannot satisfy state action, and in such a case, an official's speech may be protected even when it bears some indicia of an official's employment or authority. *Id.* at 197 (citing *Lane*, 573 U.S. at 236); *see Farmer v. Gonzalez*, 2022 WL 4591637, at *6 (E.D. Ky. Sept. 29, 2022). In *Farmer*, for example, a sheriff's deputy alleged First Amendment retaliation when a group of public defenders wrote a letter to the sheriff expressing concern over the deputy's conduct, which they suggested

"conflict[ed] with the values expressed by the Franklin County Sheriff's Department"[12]; the letter identified the defendants as public defenders, was signed "Public Defenders at the Franklin County Trial Office," and was sent to the sheriff using a government email address. *Id.* at *1. In dismissing the action, the district court explained that Farmer failed to state a § 1983 claim for First Amendment retaliation because the letter was not state action: "It was not written on official letterhead, did not purport to be official action, and had nothing to do with Defendants' duties as public defenders. . . . [and the] use of an official email account is at most a de minimis indicator of state authority." *Id.* at *6.

Here, Morgan wrote a letter attempting to persuade his audience of SFS board members to reevaluate their professional affiliation with Plaintiffs Chase and Mayfield, which is analogous to the *Farmer* defendants' appeal for the sheriff "to re-evaluate the role and placement that Deputy Farmer has in the Sheriff's Department." *See id.* at *1; (Doc. 12-3). In both cases, the disputed communications concerned what the defendants saw as the unprofessional and unethical conduct of the plaintiffs, who were employed within entities having at least some connection to the defendants' official employment (public defenders interact regularly with sheriffs' departments, as Morgan, as a juvenile court judge, deals with providers of children's services). *See Farmer*, 2022 WL 4591637, at *1; (Doc. 12-3). These facts are insufficient to show state action even when, as here, Morgan's concerns about Chase and Mayfield's conduct related to "information related to or learned through" his employment. *Lane*, 573 U.S. at 236; (*see* Doc. 12-3). While it may be less clear here than in *Farmer* that the topics covered in the letter had "nothing to do with" Morgan's duties, 2022 WL 4591637, at *6, there is no evidence that the

---

[12] Specifically, the letter alleged the plaintiff "attended the events in Washington D.C. on January 6th which resulted in the storming of our nation's Capital Building and multiple fatalities." *Id.* at *1.

dispute between the Parties and the concerns Morgan raised about their conduct are "ordinarily within the scope of his duties," *Lane*, 573 U.S. at 240. Furthermore, as to indicia of state authority, which are relevant to whether an official's conduct may have been "*under color* of law," there is *less* support for state action here than there was in *Farmer*. § 1983 (emphasis added); *see Screws v. U.S.*, 325 U.S. 91, 111 (1945) ("under 'color' of law means under 'pretense' of law"). Morgan identified his state employment by using an email signature reading "Judge Andrew B. Morgan," just as the *Farmer* letter was signed by "Public Defenders at the Franklin County Trial Office," but while the *Farmer* letter was sent via government email, Morgan used a personal, Gmail address, "judgeandrewbmorgan@gmail.com." (Doc. 12-3, at 1–2); 2022 WL 4591637, at *1. Finally, nowhere in the May 2024 Email does it "purport to be official action." *Id.* at *6. For all these reasons, it does not appear to satisfy the state-action requirement.

Due to these state-action deficits,[13] Plaintiffs have not shown a likelihood of success for their retaliation claim in relation to either the Arnold Call or the May 2024 Email.

    b.    The May 2024 Letter and SFS Decision

Plaintiffs have a more viable retaliation argument remaining—in relation to the May 2024 Letter and BCJC's decision to cease contracting with Plaintiffs[14]—and they have shown at

_____

[13] As with its *Lindke* analysis with respect to the Facebook page, the Court's conclusions that Plaintiffs have not established a likelihood of state action for the Arnold Call and the May 2024 Email are based only on the Parties' legal arguments and evidentiary submissions on this motion for a preliminary injunction. Nothing in this order should preclude Plaintiffs from attempting to establish state action for this conduct at later stages of this litigation.

[14] Although Plaintiffs present the May 2024 Letter and Morgan's "maintaining a policy banishing them from providing services to . . . parties to Bradly County Juvenile Court cases" as two separate bases for their retaliation claim, the Court is not convinced there is a meaningful distinction between them at this juncture. (*See* Doc. 12, at 10.) As the Court's analysis will show, the letter appears to be the official announcement of this "policy," and, in any event, it is the only evidence in the record *of* the contracting decision.

least some likelihood of success on this basis. (*See* Doc. 12, at 10–11.) A juvenile court's decision regarding its contract with a children's services provider is state action, and the Court is satisfied that the May 2024 Letter is likely state action because (on top of, and more important than, its being on official letterhead) it "purport[s] to be official action" by announcing the contracting decision. 2022 WL 4591637, at *1; *see Robertson*, 753 F.3d at 614; (Doc. 12-2). The letter's text is plainly consistent with its being Morgan's official announcement of this contracting decision, as it (1) begins by stating that "Solomon Family Solutions has been removed as a service provider in Bradley County Juvenile Court due to the following bad acts. . .," (2) enumerates those "bad acts," and (3) concludes, "[d]ue to the foregoing reasons, Solomon Family Solutions, Andrea Chase and Blythe Mayfield will not be utilized in any way by the Bradley County Juvenile Court." (*Id.*)

As to the merits of the retaliation claim, it appears likely that at least some of Plaintiffs' actions prior to the May 2024 Letter and contracting decision, such as the TikTok posts, constituted protected speech (the first element of a retaliation claim). *Ryan*, 979 F.3d at 526. Plaintiffs' claim is likely to succeed on the second element because it is plausible that the loss of a contract with BCJC would "chill a person of ordinary firmness from continuing" to speak publicly about concerns relating to BCJC and one of its judges. *Id.* Finally, the May 2024 Letter presents evidence that may suggest the contracting decision "was motivated at least in part by [Plaintiffs'] exercise of [their] constitutional rights" because, in explaining the decision, the letter makes multiple references to Plaintiffs' speech. *Id.*; (*see* Doc. 12-2 (listing among many "bad acts," for example, "false reports to the Department of Children Services," "making false allegations of pecuniary gain by the Court," and "making libelous statements about the Judge"). At the same time, the letter's descriptions of what Morgan characterizes as Plaintiffs' "bad acts"

demonstrate a potential problem: to the extent Plaintiffs' speech about Morgan is actionable under civil tort law (as "libelous" or otherwise), it may not constitute protected speech. *See N.Y. Times v. Sullivan*, 376 U.S. 254, 277 (1964) ("What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law"). Plaintiffs correctly point out in their reply brief that civil tort doctrines often incorporate mens rea requirements—which are especially stringent in contexts involving criticism of public officials—to avoid infringing on First Amendment freedoms; nonetheless, Plaintiffs fail to explain why any of the specific so-called "bad acts" cited in the May 2024 Letter were, in fact, protected speech rather than tortious conduct. (*See* Doc. 12, at 10; Doc. 25, at 1.) This lack of elaboration is crucial because even though the record shows (a) that Plaintiffs likely engaged in some protected speech prior to the May 2024 Letter and (b) the letter cites various forms of speech, Plaintiffs have not demonstrated clearly that at least one of their protected activities actually *motivated* the alleged retaliation.[15] Thus, although Plaintiffs appear to have a colorable retaliation claim, the Court is not convinced they have shown a *strong* likelihood of success on the merits of this claim. *See Certified Restoration Dry Cleaning Network*, 511 F.3d at 542.

> ### iii.     *Coercion of a Third Party*

"[A] government entity's 'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment." *Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175, 180 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). To succeed on a third-party coercion claim, a

---

[15] For instance, one of activities that appears most likely to be protected speech is Chase's TikTok posts, but it is not clear from the text of the May 2024 Letter that the TikTok posts were one of her "bad acts," and Plaintiffs cite no other evidence to suggest the letter and contracting decision were in retaliation to those posts specifically. (*See* Docs. 12-1, 12-2.) The same is true of the call-to-action post. (*See* Doc. 12-2.)

plaintiff must demonstrate "conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191 (citing *Bantam Books*, 372 U.S. at 67–68). Plaintiffs' argument on this claim, though not entirely clear, points to four different actions taken by Morgan: (1) a "clear threat" they contend he made in the Arnold Call, (2) the May 2024 Letter, (3) the May 2024 Email, and (4) his alleged Facebook blocking of Chase and Mayfield. (*See* Doc. 12, at 11–12.)

Plaintiffs' arguments on this claim are unavailing for three reasons. First, as the Court has explained previously, Plaintiffs have not shown a likelihood of state action for three of these four actions (the Arnold Call, the May 2024 Email, and the alleged blocking). Second, for two of these actions, it is not clear *who* Plaintiffs suggest is the third party being coerced: the May 2024 Email was sent to members of the SFS board, but they are agents of a named plaintiff, SFS, not third parties[16]; and as for the Facebook blocking, the Court is at a loss for who the relevant third party might be.[17] Third and finally, it does not appear that any of the actions Plaintiffs cite present a tangible "threat of legal sanctions" or any similar "means of coercion . . . to achieve the suppression of disfavored speech." *Nat'l Rifle Assoc. of Am.*, 602 U.S. at 180 (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)) (cleaned up). While the Arnold Call and the May 2024 Email may be construed as attempts at persuasion, there is no evidence that either *threatened* Arnold or the SFS board members respectively with legal sanctions, or otherwise "convey[ed] a threat of adverse government action" should they ignore Morgan's concerns.

---

[16] Alternately, Plaintiffs' theory might be that the third party is SFS itself, as they suggest in their reply brief that Morgan "coerce[d] SFS to sever ties with Chase and Mayfield." (Doc. 25, at 2.) But as far as the Court can tell, SFS is a party to this lawsuit.

[17] Plaintiffs make no attempt to explain how the Facebook page connects to a third-party claim, suggesting merely that "Defendant's decision to block Plaintiffs Chase and Mayfield from his official Facebook page further demonstrates an intent to suppress their speech." (Doc. 12, at 12.)

*Nat'l Rifle Assoc. of Am.*, 602 U.S. at 191; (*see* Docs. 12-3, 12-6).  There is likewise no evidence

that the May 2024 Letter or the Facebook blocking conveyed such a threat "in order to punish or

suppress" Plaintiffs' speech (the letter, even insofar as it may constitute retaliation, concerns a

government action that had *already* occurred, the contracting decision, and makes no apparent

threat of future "adverse government action[s]").  *Nat'l Rifle Assoc. of Am.*, 602 U.S. at 191; (*see*

Doc. 12-2).  For all these reasons—*any of which* could doom a third-party coercion claim—

Plaintiffs have not established a likelihood of success on this basis.

       *iv.*       **Prior Restraint**

      "A prior restraint is an administrative or judicial order that forbids certain speech *ahead*

of when that speech is planned to take place."  *Novak v. City of Parma, Ohio*, 33 F.4th 296, 307

(6th Cir. 2022) (emphasis in original) (citing *Alexander v. United States*, 509 U.S. 544, 550

(1993)), cert. denied, 143 S. Ct. 773, (2023).  In support of their prior-restraint claim, Plaintiffs

argue that "[t]he contents of the May 2024 Letter [], taken in context with the December 28,

2023 call to Ms. Arnold and the May 2024 email [], clearly threaten legal sanctions in order to

suppress Plaintiff Chase's disfavored speech."  (Doc. 12, at 14.)  However, as the Court

explained in the previous section, it is not clear how any of this conduct actually threatens legal

sanctions or any other concrete action that would "forbid[ Plaintiffs'] speech *ahead* of when that

speech is planned to take place."  *Novak*, 33 F.4th at 307.

      Plaintiffs cite several authorities for the proposition that a letter or email can constitute an

"administrative order" that can give rise to a prior-restraint violation.  (*See* Doc. 12, at 13 (citing

multiple Supreme Court and Sixth Circuit precedents).)  The May 2024 Letter may indeed

constitute an administrative order because it announces BCJC's decision to cease contracting

with SFS, *see Novak v. City of Parma*, 932 F.3d 421, 432–33 (6th Cir. 2019) ("we should not be

overly formalistic in defining what counts as an administrative order"); however, nothing in the letter suggests it is a prior restraint on Plaintiffs' speech, as it appears devoted entirely to announcing an administrative decision based on Plaintiffs' *past conduct*. (*See* Doc. 12-2.) Consider it this way: the May 2024 Letter announces the contracting decision, which it attributes to various "bad acts" that may include protected speech; had Plaintiffs nonetheless continued to engage in these same "bad acts" (including all forms of speech it describes) following the letter's publication, they could not be said to be *in violation* of it—they would simply continue to have no contract with BCJC. (*See id.*) In other words, the letter does not "forbid[] speech" in any legally relevant fashion. *Novak*, 33 F.4th at 307; (*see* Doc. 12-2). Furthermore, even if Plaintiffs could establish state action with respect to either the May 2024 Email or the Arnold Call, there is likewise no evidence that they "forbid[ Plaintiffs'] speech *ahead* of when that speech is planned to take place." *Novak*, 33 F.4th at 307; (*see* Doc. 12-3, 12-6).[18] Thus, Plaintiffs have not established a likelihood of success on this claim.

---

[18] Plaintiffs argue the email "is tantamount to an administrative injunction because it prohibits speech by Plaintiffs Chase and Mayfield." (Doc. 12, at 14.) But as the Court explained in reference to the viewpoint-discrimination claim, there is no evidence to suggest the May 2024 Email actually prohibits speech; this argument is thus unavailing as to either state action or prior restraint.

As for the Arnold Call, Plaintiffs seem to recognize it cannot be construed as an administrative order given their suggestion that "[t]he contents of the May 2024 Letter [], *taken in context with the December 28, 2023 call to Ms. Arnold* . . . clearly threaten legal sanctions"; but this framing cannot bootstrap the call into being state action sufficient for a prior-restraint claim. (Doc. 12, at 14 (emphasis added).) Additionally, Morgan moves to exclude certain portions of Arnold's declaration, including (a) her statement that "the overall call gave the impression that a storm is coming"; and (b) a paragraph recalling that she "took that phone call to mean that Morgan would be taking adverse actions against Chase and Mayfield however he could do so, and that SFS would also suffer adverse consequences if Chase, Mayfield, and Dye were not terminated." (Doc. 12-6, at 2; *see* Doc. 17, at 1–2.) These statements are vague and conclusory at best; regardless, the Court need not consider their contents further given that Plaintiffs have cited no evidence in support of the proposition that a phone call can impose a prior restraint on protected speech. (*See id.*)

In sum, the Court finds Plaintiffs have failed to establish a likelihood of success on their claims, with the exception of their retaliation claim in relation to the May 2024 Letter and the BCJC contracting decision, for which they have shown at least some likelihood of success.[19]

## C. Equitable Factors and Availability of the Injunctions Requested

A preliminary injunction is an "extraordinary and drastic remedy"—even when a plaintiff is likely to succeed on the merits, preliminary relief may not be warranted when the equitable factors are lacking. *See Fowler*, 924 F.3d at 256. Irreparable harm is of particular importance among the equitable factors, especially when the likelihood of success on the merits is uncertain. *See Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982) ("in

---

[19] In addition, Plaintiffs argue in their reply brief that "Defendant Morgan failed to respond in any meaningful manner to core issues raised by the Plaintiffs[, which] constitutes a concession on those issues," but this argument is unavailing. (Doc. 25, at 2.) While there are some contexts in which a party's failure to respond can constitute waiver or abandonment of an issue or claim, failure to respond in a meaningful or rigorous manner to certain issues in response to a motion for preliminary injunction is not one of them. *See*, *e.g.*, *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it *in response to a motion for summary judgment*") (emphasis added). Plaintiffs cite two non-binding cases in support of this argument, *AK v. Behavioral Health Systems, Inc.* and *Mahan v. Core Values Roadside Service, LLC*, but neither supports the proposition that an insufficient response can waive opposition to a preliminary injunction. *See* (Doc. 25, at 2); *AK v. Behavioral Health Systems, Inc.*, 382 F. Supp. 3d 772, 775 (M.D. Tenn. 2019) (finding on a motion to dismiss that, "in failing to respond to BHS' threadbare arguments about class-wide relief, discovery, and the penalty provision of Section 1132, Plaintiffs have conceded nothing."); *Mahan v. Core Values Roadside Service, LLC*, 2020 WL 1291589, at *3 (S.D. Ohio Mar. 18, 2020) (finding on motion to transfer venue that a forum-selection clause was enforceable when, inter alia, the plaintiffs cited no legal authority to support their contention that the agreement terminated when they stopped taking referrals).

In any case, the Court finds Morgan's response brief sufficient to indicate opposition at this stage, as it contends that Plaintiffs have not established a likelihood of success on the merits and clearly opposes entry of a preliminary injunction. (*See* Doc. 19.) Further, Plaintiffs' own briefing leaves ample room for improvement. Plaintiffs say, for instance, that "Morgan's response fails to contest the Plaintiff's [sic] central claim that their activities constitute protected speech," but they themselves make no effort to cite relevant authorities demonstrating affirmatively (nor do they attempt to explain) why those activities were protected. (Doc. 25, at 2; *see* Doc. 12, at 10 (stating in conclusory fashion that certain speech was protected).)

general, the likelihood of success that need be shown . . . will vary inversely with the degree of injury the plaintiff will suffer absent an injunction.") (citation omitted); *Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) ("[A] stay may be granted with either a high probability of success and some injury or vice versa."). Still, none of the equitable factors must be dispositive, and "when a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Emps. Ass'n*, 751 F.3d at 430 (citations omitted).

Recall that Plaintiffs seek four forms of preliminary relief: (1) an injunction enjoining Morgan "from blocking Plaintiffs Chase and Mayfield from the Judge Andrew B. Morgan Facebook [page]"[20] (the "Facebook Injunction"); (2) an injunction ordering Morgan "to publicly retract" the May 2024 Letter and the May 2024 Email (the "Retraction Injunction"); (3) an injunction enjoining Morgan "from taking any further actions to coerce, threaten, or intimate repercussions directly or indirectly to third parties for Plaintiff Chase's protected speech activities; and (4) an injunction enjoining Morgan "from taking any non-judicial action to punish or sanction any plaintiff based on the First Amendment protected speech of any plaintiff" (3 and 4 collectively, the "General Injunctions"). (Doc. 11, at 1–2.) Because some of these injunctions present unique issues, the Court will address them in turn.

---

[20] This is phrased as an injunction to enjoin blocking, not for Morgan to unblock Chase and Mayfield, which contributes further to the ambiguities in the record regarding whether they are currently blocked. Given the problems the Court has already discussed with Plaintiffs' viewpoint discrimination claim, as well as its analysis in the following section, it will be sufficient to construe this injunction as ordering Morgan to cease interfering with Chase and Mayfield's access to the page (which would include either unblocking them now or, if they are not blocked, refraining from blocking them again in the future).

###### i. The Facebook Injunction

In its analysis of the merits of Plaintiffs' viewpoint-discrimination claim, the Court found they likely lack Article III standing to seek relief regarding the Facebook page. *See Lujan*, 504 U.S. at 560 (discussing standing requirements). Here, for the same reasons Plaintiffs have failed to demonstrate a redressable injury in relation to the Facebook page, there is no reason to believe they will suffer irreparable harm in the absence of an injunction prescribing Morgan's conduct in relation to the page. *See id.*; *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 542. Because there is no evidence to show Plaintiffs (a) have ever commented on, or engaged in any other form of protected speech by means of having access to, the Facebook page, or (b) would do so if they were not blocked, there is no evidence that they suffer any First Amendment harm in the absence of the Facebook Injunction. (*See* Doc. 12, at 6–8, 15–16.) Therefore, since Plaintiffs have not demonstrated a likelihood of success on the merits of their viewpoint-discrimination claim and there is no evidence of irreparable harm, the Court will deny this injunction. *See City of Pontiac Retired Emps. Ass'n*, 751 F.3d at 430 (noting that courts need not "make specific findings concerning each of the four factors . . . if fewer factors are dispositive of the issue" (citations omitted)).[21]

###### ii. The Retraction Injunction

Plaintiffs' request that the Court order Morgan to retract the May 2024 Letter and the May 2024 Email presents a separate issue: the Court may lack subject-matter jurisdiction to issue this injunction under the doctrine of sovereign immunity. *See, e.g.*, *Ladd v. Marchbanks*, 971 F.3d 574, 577 (6th Cir. 2020) (analyzing a motion to dismiss based on sovereign immunity

---

[21] Given the above analysis, furthermore, the Court need not reach the argument Plaintiffs make in their reply brief that "[e]ven if Plaintiffs are unblocked, Morgan should still be enjoined based on the voluntary cessation doctrine." (Doc. 25, at 7.)

under Federal Rule of Civil Procedure 12(b)(1)).  Pursuant to the Eleventh Amendment, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Courts have interpreted the Eleventh Amendment as conveying sovereign immunity to states and, in some cases, their officials.  *See Boler v. Earley*, 865 F.3d 391, 409–10 (6th Cir. 2017).  There are three exceptions to sovereign immunity:  (1) "when the state has waived immunity by consenting to suit"; (2) "when Congress has expressly abrogated the states' sovereign immunity"; and (3) "when the doctrine set forth in in *Ex parte Young*, [209 U.S. 123 (1908),] applies."  *Id.* (citing *Puckett v. Lexington-Fayette Urban Cnty. Gov't*, 833 F.3d 590, 598 (6th Cir. 2016)).

Under *Ex parte Young*, "the Eleventh Amendment does not bar a lawsuit seeking an injunction against a state official prohibiting the state official from enforcing a state statute that allegedly violates the United States Constitution" or otherwise violating federal law.  *Dubuc v. Mich. Bd. of L. Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003).  The rationale for this exception is that when a state official violates federal law, he is considered to be acting outside of his official authority:  "when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes."  *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011).  To determine whether *Ex Parte Young* applies, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (alteration in original) (quoting *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)).

Presumably, Plaintiffs are relying on the *Ex Parte Young* exception to sovereign immunity, as they cite no evidence to suggest Tennessee has consented to suit, or that Congress has abrogated the immunity of Tennessee's officers, with respect to Plaintiffs' claims. (*See generally* Docs. 12, 25.) The *Ex Parte Young* doctrine often facilitates injunctive relief in § 1983 cases due to its capacity to bar unconstitutional actions by state officers. *See Dubuc*, 342 F.3d at 616. For example, if Plaintiffs had demonstrated a redressable First Amendment injury on their viewpoint-discrimination claim, the Court would have jurisdiction to issue the Facebook Injunction because it would be ordering Morgan to refrain from denying Chase and Mayfield access to the Facebook page going forward. *See id.*

The Retraction Injunction, however, appears beyond the scope of the *Ex Parte Young* exception, and thus barred by sovereign immunity, for three reasons: First, ordering Morgan to retract past statements is not "properly characterized as *prospective*." *Verizon Md.*, 535 U.S. at 645 (emphasis added). When the alleged wrongdoing is speech (as is a letter or email), issuing a statement publicly retracting that speech is about as close as a human being can get to waving a magic wand and saying "*Forget this ever happened*"; it is essentially retroactive in nature and implication. *See id.* Second, the Retraction Injunction would be inconsistent with *Ex Parte Young*'s rationale because it would effectively compel Morgan to engage in an affirmative speech act (the retraction)—which can hardly be described as "command[ing] a state official to do nothing more than refrain from violating federal law."[22] *Va. Off. for Prot. & Advoc.*, 563 U.S. at 255. Third, given these inconsistencies with *Ex Parte Young*, as well as the broader federalist

---

[22] Consider, for instance, that if the May 2024 Letter were an unlawful prior restraint on Plaintiffs' speech as Plaintiffs contend, an appropriate form of relief under *Ex Parte Young* would be an injunction *enjoining Morgan from enforcing* the letter as to their speech going forward. *See Dubuc*, 342 F.3d at 616.

principles underlying the doctrine of sovereign immunity, the Court does not find it appropriate to interfere with Morgan's exercise of state authority by ordering him—a state court judge—to engage in the kind of affirmative conduct the Retraction Injunction would require, especially on a preliminary injunction. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (commenting on the need to guard against "intrusion[s by federal courts] on state sovereignty" in applying the sovereign-immunity doctrine). Thus, the Court has serious doubts that there is jurisdiction to grant this injunction.

### iii.    The Remaining Injunctions

This leaves the General Injunctions, which seek generally (and consistently with *Ex Parte Young*) to enjoin Morgan from violating Plaintiffs' First Amendment rights going forward. In considering whether these injunctions (or any other it might craft) are appropriate, the Court will focus on the claim on which Plaintiffs have shown at least some likelihood of success: their retaliation claim regarding the May 2024 Email and BCJC's contracting decision. However, even assuming Plaintiffs have a strong likelihood of success on this claim, the Court will find a preliminary injunction is not warranted on the equitable factors, particularly irreparable harm.

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). The party seeking the injunction bears the burden of clearly showing that its "injury [is] both certain and immediate, not speculative or theoretical." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (citation and internal quotations omitted). Moreover, simply showing some degree of irreparable harm will occur is not enough to merit a preliminary injunction; a court must also determine the degree of harm. *See Kentucky v. Biden*, 57 F.4th 545,

556 (6th Cir. 2023) ("[I]n our view, the peculiarity and size of a harm affects its weight in the equitable balance.").

Here, Plaintiffs have not demonstrated irreparable harm. Plaintiffs contend they have suffered irreparable harm because the "loss of First Amendment freedoms, even temporarily, constitutes irreparable harm." (Doc. 25, at 6 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (citing *Elrod*)); *see* Doc. 12, at 16.) However, the logic of *Elrod*, *see* 427 U.S. at 373–74, is unavailing here for a few reasons. First, Plaintiffs have not shown a particularly strong likelihood of success on the merits. *See City of Pontiac Retired Emps. Ass'n*, 751 F.3d at 430. Second, in many constitutional cases, it makes sense to find irreparable harm (thus favoring the use of preliminary injunctions when there is a strong likelihood of success on the merits) in part because constitutional harms are frequently difficult to quantify. *See Elrod*, 427 U.S. at 373–74; *City of Pontiac Retired Emps. Ass'n*, 751 F.3d at 430. This case, however, is different because it presents a retaliation claim where the retaliation consisted principally of the *loss of a business relationship*; this is just the kind of injury that is normally compensable by damages, and Plaintiffs have made no attempt to explain why it is not quantifiable as such. (Doc. 12, at 16; Doc. 25, at 6–7.) Finally, *Elrod* may not control when there is a possibility that an injunction could restrain *the defendant's* First Amendment rights. *See Fox v. Faison*, 668 F. Supp. 751, 772 (M.D. Tenn. 2023) ("That [*Elrod*] principle, though, has different implications in this case, because Fox is not the only individual whose First Amendment rights hang in the balance."). Such a risk is present here given the breadth of the General Injunctions and that most of Morgan's allegedly unconstitutional conduct

is also speech, especially where Plaintiffs have not established state action for most of that conduct.[23]  *See id.*

Furthermore, the Court finds the public-interest element weighs against issuing the General Injunctions (or similar relief it might fashion) because it would not serve the public interest to circumscribe the conduct of a state court judge unnecessarily, particularly when Plaintiffs appear unlikely to succeed on most of their claims and have not shown irreparable harm.  *See Certified Restoration Dry Cleaning Network*, 511 F.3d at 542.  For all these reasons, the equitable factors do not support a preliminary injunction.  *See id.*

### III.    Motions to Exclude

The motions to exclude before the Court include (1) Morgan's motion to exclude portions of the declarations of Destiny Arnold and Chrissy Blackwell (Doc. 17); (2) Plaintiffs' motion to exclude portions of the declaration of Natalie Barrionuevo (Doc. 27); (3) Plaintiffs' motion to exclude portions of the declaration of Jessica Conine (Doc. 28); (4) Plaintiffs' motion to exclude portions of the declaration of Gabria Hubbard (Doc. 29); (5) Plaintiffs' motion to exclude portions of the declaration of Morgan (Doc. 30); and (6) Plaintiffs' motion to exclude portions of the declaration of Melissa Parsons (Doc. 31).  All the declarations at issue in these motions are exhibits the Parties attached to their briefings on Plaintiffs' motion for a preliminary injunction. (*See* Docs. 12-6 (Arnold), 12-7 (Blackwell), 19-1 (Morgan), 19-2 (Hubbard), 19-3 (Conine), 19-4 (Parsons), 19-5 (Barrionuevo).)  In the above analysis of the motion for a preliminary

---

[23] The Court raises this issue notwithstanding that the May 2024 Letter likely is state action (and thus cannot be protected speech), as conduct like the letter, the May 2024 Email, and the Arnold Call all illustrate *Morgan's desire to speak* regarding his concerns about Plaintiffs' conduct.  In any case, to the extent a more limited injunction might be warranted with respect to the May 2024 Letter, the Court has already explained that it probably lacks jurisdiction to issue the Retraction Injunction.

injunction, however, the Court did not rely on any of the disputed portions of the declarations. As a result, all the motions to exclude (Docs. 17, 27, 28, 29, 30, 31) are moot. [24]

## IV.     CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** Plaintiffs' motion for a preliminary injunction (Doc. 11) and, accordingly, **DENIES AS MOOT** all motions to exclude (Docs. 17, 27, 28, 29, 30, 31).

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

---

[24] Nothing in this order should preclude the Parties from moving to exclude the same or similar statements from these witnesses at a later stage of this litigation.

Case 1:24-cv-00265-TRM-MJD     Document 42     Filed 03/26/25     Page 32 of 32
PageID #: 564